FILED

OCT 16 2012

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

99500

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLORIA E. SWANSON,                )
                                  )
        Plaintiff,                )
                                  )    12cv8290
        v.                        )    Judge Amy J. St. Eve
                                  )    Magistrate Arlander Keys
BAKER & McKENZIE, LLP, a          )
limited liability partnership,    )
NANCY OFFDENKAMP, and             )
PATRICIA GRIFFIN,                 )
                                  )
        Defendants.               )

## COMPLAINT

NOW COMES Plaintiff, GLORIA E. SWANSON, on her own behalf as pro se Plaintiff

for her Complaint against Defendants BAKER & McKENZIE LLP, NANCY OFFDENKAMP,

and PATRICIA GRIFFIN, and states as follows:

1.      This action seeks redress for wrongful and illegal discrimination as a form of

retaliation against Gloria E. Swanson (hereinafter "Swanson") by Defendant Baker & McKenzie

LLP (hereinafter "Baker") and its agents Nancy Offdenkamp ("Offdenkamp"), Patricia Griffin

("Griffin") and other unknown personnel in Baker's Human Resources Department in violation

of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. §§ 2000, et seq., 42 U.S.C. §

1981.

2.      Swanson also charges Baker for defamation of character resulting from false

statements made by Baker over an unknown period of time, but not discovered by Swanson until

on or about July 18, 2012, that Baker was telling Swanson's prospective employers who called

Baker for a reference for Swanson that, "We do not have a Gloria Swanson on file" and that Baker had no record of Swanson nor of her social security number as Swanson ever having worked at Baker & McKenzie. This defamation harmed Swanson's reputation causing her to be in the "running" between either two candidates or the best five (5) candidates and suddenly, Swanson was not chosen. Upon information and belief, Baker & McKenzie's reference regarding Swanson not ever working there or Swanson's employment not being on file at Baker & McKenzie caused prospective employers to believe that Swanson was lying on her resume regarding her five (5) year and three (3) month employment as an Executive Legal Secretary at Baker & McKenzie, causing Swanson to be bypassed for employment. If a prospective employer has to choose between two qualified applicants, one with positive references and one with a mediocre or bad reference - in this case a reference from Baker & McKenzie that denied her existence at that firm and painting Swanson as a liar, it is obvious which applicant the prospective employer will choose.

3.      Baker has impugned Swanson's good name and reputation and is therefore guilty of defamatory slander and retaliation in violation of Title VII of the Civil Rights Act of 1964, §704, codified as 42 U.S.C. §2000e-3(a) and 42 U.S.C. §1981 (Retaliation) , 42 U.S.C. §2000e-3(a) *Robinson v. Shell Oil Co.*, 519 U.S. 3376 (1997) Whether these acts were committed solely at Baker's direction or contained to their Human Resources Department personnel's bias, employers are vicariously liable for acts of retaliation committed by their mid and low-level personnel. *White v. Burlington Northern & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 204) (en banc), *cert. granted*, 126 S.Ct. 1671 2006). Additionally, Section 704 codified as 42 U.S.C. § 2000e-3(a) states that, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has

opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title." Swanson seeks declaratory and injunctive relief as well as monetary damages for her injuries.

## JURISDICTION AND VENUE

4.      The present action alleges claims premised on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq. Subject matter jurisdiction for those claims is premised pursuant to 28 U.S.C. § 1331. The amount in controversy exceeds $75,000.00.

5.      Venue is proper in the Northern District of Illinois because the acts at issue were perpetrated against Plaintiff Gloria E. Swanson (hereinafter "Swanson" and/or "Plaintiff") who is a resident in this district.

6.      Defendant, Baker & McKenzie LLP, a limited liability partnership, was founded in Chicago and is domiciled in the State of Illinois, among other places.

## FACTS

7.      On or about July 18, 2012, after hiring a reference checking company to check Swanson's references to ascertain why Swanson was not being hired as a legal secretary after testing excellently, and interviewing well with 30 years of legal secretarial experience, Swanson was told by the reference checking company, Allison & Taylor, that Baker & McKenzie's HR Manager, Patricia Griffin, (hereinafter "Griffin") returned their telephone reference call to state that they could not find Gloria Swanson in their system. They further stated that "*They do go back that far but she is not there based on name and social security number*." (Exh. 1) While one's social security number is the equivalent of one's name, Swanson was asked if she could have possibly worked under another name. (Exh. 2) Swanson informed the reference checker

that she has been "Gloria Swanson" since 1973, while her employment with Baker was from February 2, 1990 through May 22, 1995 and that she definitely worked at Baker under her current name, Gloria Swanson. Swanson also supplied the name of her former boss, the lawyer for whom she worked during her tenure at Baker, Thomas M. Haderlein, as well as the name of the then Human Resources Manager, Carol Lincoln.

8.  On July 19, 2012, the reference checker again contacted Baker's HR Manager, Patricia Griffin who returned the call and stated, "She does not have you in the system". When the reference checker mentioned Swanson's ex-boss, Thomas Haderlein, and the HR Manager, Carol Lincoln, Griffin was able to quickly verify Thomas Haderlein in the system as starting in 1959 as well as showing the name of Carol Lincoln in their system as starting 1982. How could Baker find employees going back 50 and 30 years, but not have a record of Swanson from 1990 through 1995? Griffin had stated earlier that the system "does go back that far" in relation to Swanson's 1990 through 1995 employment, but stated that Swanson was not in there. Griffin further stated that a Baker 32-year legal secretary named Ellie Nichol would be asked if she "remembered" Swanson and get back to the reference checker (Exh. 2). Swanson was asked by the reference checker if Swanson knew Ellie Nichol, but Swanson should not be expected to rely on the memory of a "secretary" as to whether or not Swanson worked at Baker for over five (5) years.

9.  On July 23, 2012 Griffin returned a call by the reference checker and stated that Ellie Nichol was "familiar with Swanson's name" but they could not find Swanson in their database. She further stated that the director of all secretaries at Baker gave her a name of Jennie Hirsch who should be able to assist. (Exh. 2)

10.     Humiliated and appalled by these untrue statements being made by Baker that were painting Swanson as a liar regarding her employment history at Baker, Swanson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2012, charging racial discrimination stating, among other things, that "I believe that I have been discriminated against because of my race, Black, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended. (Exh. 3)

11.     On August 2, 2012, the EEOC issued to Swanson a Notice of Suit Rights, i.e., "Right to Sue Notice". Swanson's claim is being filed within 90 days of receipt of the EEOC's "right to sue" notice for the charge numbered 440-2012-04583. (Exh. 4)

12.     On July 26, 2012, without knowledge that Swanson had filed her EEOC complaint three days prior, Offdenkamp returned a call to the reference checker and stated that their systems have changed and that she was trying to access an old payroll system. Offdenkamp said, "I can't confirm she worked here or deny she worked here . . . it's been too long." (Exh. 2) Offdenkamp further stated that she would call the reference checker if she found anything, but added that she doubted that she'd find anything since it's been so many years.

13.     The reference checker then mentioned to her that when she was speaking with Griffin, Griffin was able to pull up two names of people Swanson worked with who started in 1959 and 1982. Offdenkamp's response was, "*They are still active employees and would be in the system.*" Swanson had advised the reference checker that Mr. Thomas Haderlein died in 2007. Therefore, the reference checker simply told Offdenkamp, "I don't think so, especially Mr. Haderlein" in response to Offdenkamp's statement that Haderlein and Lincoln were still active employees. However, Offdenkamp persisted in her assertion to the reference checker by again

saying "active employees would be in the system". Plaintiff asks this Court, how can a deceased employee (Thomas Haderlein) be an active employee?

14.     On at least three occasions between July and August of 2012, after Swanson became aware of the findings of the Reference Checker, Swanson telephoned Griffin, Offdenkamp and a Baker labor attorney, Maura Ann McBreen ("McBreen"), who had written the settlement agreement in 1995 at the time of Swanson's termination from employment with Baker. Swanson never spoke with these three persons, but left voicemail messages advising them of the illegal tactics regarding Swanson's employment reference by Baker.

15.     Swanson advised each of these persons that she had possession of her income tax returns for all of the years she worked at Baker, along with the W-2 forms for each year that Baker issued to Swanson and to the federal government reporting Swanson's income with Baker's EIN number on said W-2 forms. Along with this proof, Swanson also had a check stub from Baker & McKenzie from 1991, a photo at a Baker Christmas Party of Swanson and her boss, Thomas Haderlein, where the jacket holding the photo said "Baker & McKenzie, Season's Greetings, December 1991". Swanson further advised these individuals, Offdenkamp, Griffin and McBreen that someone from Baker needed to contact Swanson in order to straighten out and redress these untruths.

16.     Offdenkamp responded on July 25, 2012 to Swanson's voicemail message left for Griffin with a telephone call to Swanson, leaving a message on Swanson's answering machine stating, "Good afternoon, this message is for Gloria Swanson. My name is Nancy Offdenkamp, and I am in the Human Resources office at Baker & McKenzie here in Chicago. And I received your inquires from, from Patricia Griffin. And I wanted to let you know that we are attempting to look in a system that was pulled out of use several years ago, the former payroll system, to

6

verify your employment. But I can't make any guarantees because I, I don't know how long that system will have history in it. But we are attempting to. Otherwise, we are required by law to maintain personnel records for anyone who has departed the firm for seven (7) years following the date of departure. So we're well past that point in your situation. If we are able to verify those dates of employment, we'll happy to provide you with a letter, and if not, I will let you know that as well. So I just wanted to let you know what we were doing about it. And, you know, I will keep you posted. Thanks very much. Have a good day."[1]

17.     Swanson had informed Griffin in that message that she had tax returns and W-2 forms issued by Baker for her 5-year employment. However, no one from Baker ever asked to see Swanson's proof by way of her tax returns and W-2's from Baker for her five-year employment from 1990 to 1995. At that point, once Baker realized that Swanson had proof of her employment and that Offdenkamp could not simply blow Swanson off by saying "If we find you in the system, we'll be happy to send you a letter confirming that but if we don't find you in the system, we'll advise you of that also". Baker obviously did not expect Swanson to be able to produce records and W-2 forms going back to 1990 through 1995. At that point, rather than attempt to correct the misinformation from Swanson's proof, Baker then went into "damage control" instead of attempting to rectify the matter with Swanson. Baker never responded further to Swanson's telephone calls and never asked to see Swanson's W-2's and other proof of her employment there.

## BACKGROUND

18.     Swanson further advised Baker that she had in her possession a letter from McBreen dated in January of 1996 where McBreen is attempting to convince Swanson that there

---

[1]     Swanson is in possession of the audio microcassette tape of Offdenkamp's message of July 25, 2012 which Offdenkamp left in her own voice on Swanson's answering machine which is word-for-word quoted above.

was no institutional bias against Swanson because Swanson worked for a very senior attorney

and that Swanson was not only one of the highest paid legal secretaries in the tax department, but

one of the highest paid secretaries in the firm. (Exh. 5)  This letter from McBreen was in

response to a letter Swanson had written to McBreen in late 1995, after she had signed a

Termination Agreement and Release in Full with Baker and after Swanson had been departed

from Baker for over six (6) months.

19.     At that time and in that letter to McBreen in late 1995, Swanson expressed her

disappointment that she was discriminated against and forced to leave Baker and lose her five

years of employment seniority.  Swanson also expressed in that letter, as she had expressed when

she went to personnel in May of 1995, unable to continue in the verbally abusive working

relationship she endured under Thomas Haderlein, that she, Swanson, should have been able to

request a transfer of assignments the same as white secretaries who had requested and received

transfers from one attorney assignment to another.

20.     In May of 1995, when Swanson went to personnel and asked for an assignment

change due to the worsening abuse by her assigned attorney, Haderlein, Swanson was told that

because of her "Executive Legal Secretarial" position, and her salary associated with that title,

despite the ability of white secretaries to transfer to other assignments within the firm, there were

no other positions at Swanson's salary.

21.     McBreen's response letter dated January 8, 1996 (Exh. 5) confirms that Swanson

complained of discrimination because McBreen's letter specifically denies that there was any

"institutional bias" against Swanson. *CBOCS West, Inc. v. Humphries*, 2008 WL 216860 (S. Ct.

May 27, 2008).  While Swanson attempted to report Baker's discrimination to the EEOC after

she obtained another job in 1995 and after she was no longer under duress, the EEOC was not

able to file a complaint since Swanson had released Baker under the Termination Agreement. However, in the instant case of retaliation by Baker against Swanson, a retaliation claim may proceed even if the original discrimination claim was found to be without merit. *White*, Id.

22.     In May of 1995, when Swanson returned from vacation and went to Human Resources instead of to her desk after five years of continued abuse by a verbally abusive and cruel senior partner, Swanson was told she could not transfer to another assignment as other secretaries had. These other secretaries happened to be white. Again, the excuse given to Swanson for the refusal of her transfer was that there were no other positions at her salary. At the time, Swanson knew that white secretaries making equivalent pay as Swanson were allowed to transfer assignments. However, Baker would not relent due to the power of the senior partner Swanson worked for, Haderlein, and Swanson was forced to resign, with an offer of five (5) weeks pay, one week for every year that Swanson was employed at Baker.

23.     Indignant at the "double standard", Swanson left the firm without signing the Release which would have prohibited her from suing Baker for its discrimination. At that time, Swanson wrote a list of the disparities in her treatment and came back into the firm a couple of weeks later to speak with the labor partner, McBreen, about her plight. Swanson did not want to have to give up her five years of seniority, but could no longer deal with the abuse of Haderlein who had become ill with emphysema which caused him to become even more verbally abusive towards Swanson in his frustration and irritability due to his illness. The reason that Swanson lasted over five years with this powerful, senior partner was simply because of her excellent secretarial skills and Haderlein's trust in Swanson's ability to get his professional, legal and personal matter work done accurately and professionally.

9

24.     In a meeting in June of 1995 with McBreen, McBreen reiterated to Swanson again that she could not have a transfer despite the fact that other secretaries had been allowed to transfer to other assignments only months before May of 1995. McBreen stated that she would attempt to negotiate a better termination and settlement agreement for Swanson, i.e., to keep Swanson from suing.

25.     In June, 1995, Baker then offered Swanson a better settlement instead of the five weeks' pay. Due to the economic pressures of being a single parent of a disabled daughter, holding a home mortgage, and being her own sole support at the time, Swanson signed the Baker Termination and Release in Full dated June 19, 1995 (Exh. 6) (hereinafter "Termination Agreement"). That Termination Agreement involved a monetary settlement, a letter of reference signed by Carol Lincoln, then Manager of Baker's Human Resources Department, as well as out placement assistance with Mulligan & Associates. (Exh. 7). Baker is in violation of the provisions of that Termination Agreement and by this complaint, is in violation of Title VII of the Civil Rights Act of 1964, §704, codified as 42 U.S.C. §2000e-3(a) and 42 U.S.C. §1981 (Retaliation) , 42 U.S.C. §2000e-3(a) *Robinson v. Shell Oil Co.*, 519 U.S. 3376 (1997).

26.     The need for protection against retaliation does not disappear when the employment relationship ends. Post-employment "blacklisting" is sometimes more damaging than on-the-job discrimination because an employee subject to discrimination on the job will often continue to receive a paycheck while a former employee, such as Swanson, subject to retaliation may be prevented from obtaining any work in the trade or occupation previously pursued. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir.) (Title VII), *cert. denied*, U.S. 115 S.Ct. 950, 130 L.Ed.2d 503 (1994). Courts have eschewed a construction that would allow an employer to discriminate against and "black list" a former employee as long as the

employer can successfully keep the former employee from getting a job and thereby becoming technically employed by an employer . . . *Veprinsky v. Fluor Daniel, Inc.*, 87 F3d 881. The ability to blacklist a former employee, and thus foreclose future employment possibilities, is but one example of an employer's power to punish a former employee for the exercise of her Title VII rights. *Charlton*, 25 F.3d at 200; *Dunlop v. Carriage Carpet Co.*, 548 F.2d at 147. In *Veprinsky, Id.* the company was found to have provided false information about his employment history to a subsequent employer. In the instant case, Baker continually provided false information regarding Swanson's employment and only relented once they were caught giving Swanson a bad reference or even worse stating that they had no record of Swanson's employment, essentially telling prospective employers that Swanson was lying on her resume.

27.    With excellent legal secretarial experience and skills, Swanson had never had a problem obtaining a job prior to now. After a 14-year employment with another major law Chicago firm, Swanson was back in the job market and began interviewing in March of 2011. Swanson, who had always been a top contender and candidate, could not understand why, after testing well, interviewing well and oftentimes being told that the choices for employment were down to Swanson and possibly one other candidate, suddenly at the "reference stage" of the interview, testing and employment process, the prospective employers who had previously lauded Swanson's experience, skills and personality, suddenly went cold with no explanation for their sudden "turn off". This behavior, after occurring a number of times, prompted Swanson to hire Allison and Taylor, a reference checking company to ascertain who or what was preventing Swanson from getting the jobs that she was coming so close to getting. This is when Swanson discovered the untrue statements that Baker was publishing or giving out by stating that they had

no record of Swanson's employment, making Swanson appear to be a liar who had fabricated her resume for the period 1990 through 1995.

28.     After leaving the voicemail messages to McBreen, Griffin and Offdenkamp with no responses other than Offdenkamp's July 25, 2012 voicemail to Swanson, on August 6, 2012, (Exh. 8) Swanson wrote to Baker's McBreen reiterating the travesty that had taken place regarding Baker's untruthful information on Swanson's employment. Swanson therein enclosed her W-2 forms from Baker from 1990 to 1995, a paycheck stub from Baker dated December 1991, the letter from McBreen dated January 8, 1996, a letter of reference from Carol Lincoln dated July 31, 1995, a copy of the Termination Agreement as well as a color photo of Swanson and Haderlein at a Baker & McKenzie Christmas party marked "Season's Greetings, Baker & McKenzie, December 13, 1991. Baker certainly had to recognize Haderlein in the color photo. Yet in an effort for damage control to cover their retaliatory, inaccurate reference about Swanson's employment at Baker that had now been exposed and for which Swanson had offered proof to refute, Baker continued to say nothing further to Swanson. Baker's contention now that the only reason they could not verify Swanson's employment is that they had trouble accessing the payroll system that was in place from 1990 to 1995 is ludicrous because they had every opportunity to review Swanson's W-2 information which they, themselves had supplied to the federal government. Yet, they continued to ignore Swanson's pleas for them to correctly verify her employment and for them to rectify and redress with a letter admitting the wrongful and untruthful information they had been giving out regarding Swanson's employment with Baker.

29.     After ignoring Swanson's request for a letter from Baker to acknowledge the false information they had been disseminating regarding their contention of Swanson's non-existence at Baker, on or about September 13, 2012, almost two months after the reference checker's initial

calls to Baker, Offdenkamp telephoned the reference checker stating "My name is Nancy Offdenkamp and you and I had spoken several weeks ago - probably two months ago at this point, regarding an employment verification for a former employee by the name of Gloria Swanson and I had indicated we were having difficulty accessing the system that was in place at the time that she was here and we have been able to fix those issues and I told you I would call you back if I was able to verify her employment. If you could call me back, I would appreciate it. My number is: 312-816-2919." (Exh. 9) When the reference checker returned Offdenkamp's phone call, she was advised that Baker now had the information confirmed regarding Swanson's employment and would release it upon Swanson signing a release for that information. Swanson signed a release for information regarding the dates of her employment along with her title and salary at Baker, which information confirming that Swanson was employed at Baker from February 2, 1990 through May 22, 1995 was then correctly given by Baker to the reference checker. (Exh. 9)

30. First, Offdenkamp had been originally arrogant and emphatic in her messages to Swanson that if they could not confirm Swanson's employment, in so many words, too bad. Likely after a legal pow-wow regarding their liability, Baker's labor attorneys attempted to claim their defamatory and retaliatory reference for Swanson was an innocent mistake. Baker had every opportunity to rectify the matter when Swanson informed them of the tax returns and W-2 forms issued by Baker to Swanson which she possessed. But, again, obviously shocked that Swanson still had these records, Baker continued to ignore Swanson's request for correction of this erroneous and damaging reference, never asking to view Swanson's proof. Baker would have one believe that Swanson's employment data sat alone in some difficult to access, antiquated payroll system which only contained Swanson's employment records from 1990

through 1995 although they were able to easily access records of employees like Haderlein and Lincoln, going back to 1959 and 1982.

31.     Secondly, after two months[2] any prospective employer would have long hired someone else other than Swanson due to Baker's false, misleading and retaliatory reference as to Swanson's non-existence at Baker.

32.     While Offdenkamp finally confirmed Swanson's employment in mid-September, 2012 to the reference checker and also to a subsequent attorney asking for a reference for Swanson (Exh. 11), Offdenkamp still never said anything further to Swanson and never contacted Swanson regarding the fact that Baker had suddenly and mysteriously located Swanson's employment data.  Suddenly Baker had Swanson's exact dates of her employment, along with her title and her ending pay.  However, Baker still said nothing to Swanson until Swanson wrote to Baker's McBreen on September 21, 2012 (Exh. 12) advising them that no one from Baker had contacted Swanson to even advise her that they had "found" proof of her employment data nor to offer to straighten out the misinformation and outright lie that Baker had stated to any untold number of prospective employers.

33.     On September 24, 2012, seemingly in response to Swanson's September 21, 2012 letter to McBreen, and by this time being aware of Swanson's EEOC complaint as well a complaint by the Illinois Department of Human Rights which the EEOC had forwarded to that agency (Exh. 16) for a response from Baker regarding Swanson's allegations, Offdenkamp sent Swanson a one paragraph letter stating, "Please be aware that all requests for verification of your previous employment have been completed and returned to requesting parties.  We experienced a delay in accessing your employment records in the system that was in place at the time of your

---

[2]     The timeframe between Baker's initial damaging statements about Swanson to the reference checker and the time they corrected it only after Swanson's EEOC complaint and the realization that Swanson had Baker-issued W-2 forms for the periods 1990 through 1995 was two months.

employment. The system issues have been resolved, and your previous employment verified."
(Exh. 13) Baker would have one believe that only Swanson's employment records from 1990
through 1995 were sitting in a Baker payroll system by themselves when other long-time white
employees dating back to 1959 and 1982 had their records easily accessed.

34. Baker did nothing to attempt to redress the damage and harm it caused Swanson
in preventing her from obtaining employment because Baker was painting Swanson as a liar and
fraud by stating that she never worked at Baker for the 5 year and 3 month period from February
5, 1990 through May 22, 1995. Swanson will never know how many prospective employers,
prior to her enlisting the assistance of the reference checking company, where Baker's retaliatory
reference and lies prevented Swanson from getting the job. Baker's actions were intended to
completely erase any record of Swanson's employment and prevent her from obtaining
employment as a result of Baker's hateful discrimination and retaliation against a black secretary
protesting the discrimination against her by Baker. Baker hurt and damaged Swanson's
livelihood surreptitiously by preventing Swanson from obtaining employment with their
derogatory reference which made it appear that Swanson "manufactured" her five-year
employment with Baker listed on her resume. Baker surmised that Swanson would never truly
know why she was not getting the jobs she applied for. They never envisioned the introduction
of a "reference checking company" and underestimated Swanson's ability to still have her W-2
forms from 1990 through 1995.

35. Again, for Baker to come back two months after the fact to finally verify
Swanson's employment only after Swanson's EEOC complaint was filed and after their lies about
Swanson's five-year employment with them had been well documented by the reference checker
is completely self-serving damage control after Baker was caught in violation of Swanson's Title

15

VII and Section 1981 rights. If Swanson had not had her W-2 forms from Baker and had not gone to the EEOC with this proof, Baker would still be lying and denying that Swanson ever worked for them for that 5 year and 3 month period.

36.     Offdenkamp's position on July 26, 2012 to the reference checker, whom she did not know was a reference checker and whom she thought was a prospective employer, said nothing about Baker experiencing delays in accessing Swanson's employment records, but was stated as an arrogant, "*I can't confirm she worked here or deny she worked here. It's been too long.*" (Exh. 2) However, 1959, over 50 years ago, was not "too long" for Baker to access Haderlein's verification of employment, Haderlein being a white employee and Swanson's former boss. And 1982 was not "too long" for Baker to access employment verification for white employee, Carol Lincoln, a period over 30 years ago. While Offdenkamp's excuse for being able to find these long ago records for these white employees was that they "are active employees", Swanson wants to know how can Haderlein be an "active employee" when he's been deceased for over five (5) years? These actions by Baker are outright retaliatory discrimination aimed directly at Swanson and aimed at preventing Swanson from getting employment.

37.     Then after leaving a telephone message for Offdenkamp advising her that her letter of September 24, 2012 did not address or redress the wrongs committed against Swanson by Baker's illegal references in asserting that Swanson never worked there or was not in their system, Swanson then received a "scare-tactic" letter from Baker's Edward Zulkey, General Counsel Emeritus stating that ". . . all requests for verification of your previous employment have been completed and returned to requesting parties . . . at this time we consider the matter to be closed. Baker & McKenzie will not be responding to any additional inquiries into this matter." (Exh. 14)

16

38.     As a result of Baker's intentional, malicious, reckless and willful acts of retaliation against Swanson, Swanson has suffered damage to her reputation, loss of income and employment prospects, emotional distress, mental anguish, humiliation, and pain and suffering. The final report of the Reference Checker outlines the nightmare, agony and anguish which Baker subjected Swanson to in retaliation regarding her employment with them. (Exh. 15)

39.     In *Robinson*, Id. the Supreme Court ruled that the anti-retaliation provision of Title VII applies to former employees as well as current employees. Title VII which prohibits employment discrimination also prohibits an employer from retaliating against an employee who has invoked the protections of Title VII or has assisted others who have invoked it or who have simply "complained of discrimination or other protections under Title VII". Swanson, in fact, complained of discrimination to Baker in 1995 and was forced to leave the firm when she requested a transfer of assignment due to years of verbal and emotional abuse by the senior Baker attorney whom Swanson worked for, under the false excuse that there were no positions in the firm at Swanson's executive legal secretarial salary when Baker had allowed many white secretaries to change assignments prior to Swanson's request.

40.     Swanson's delay in discovering the retaliatory reference Baker was giving her was due to the fact that Swanson was employed by one firm for 14 years and was not job hunting which would prompt a reference check of her resume. However, the protection for a former employee envisioned by Title VII against retaliation lasts for as long a period as would permit the factual conclusion that the employer's negative job reference was made in retaliation for the former employee's participation in a Title VII case or under discriminatory practices protected under Title VII, i.e., racial discrimination or participating in complaining of racial discrimination. See, *Haynes v. Shala*, 902 F. Supp. 259 (D.D.C. 1995) where the judge

reasoned that this was the first time the employer had the opportunity to retaliate. Likewise, due to Swanson's 14-year employment with another firm and her recently having to re-enter the job market, this was the "opportunity for Baker to retaliate" with their untruthful reference.

41.     Baker's lies and retaliatory reference is confirmed in Allison & Taylor's July, 2012 reference check, but again, Swanson cannot ascertain how many jobs she was turned down for due to the untruthful references given by Baker since her job hunt beginning in 2011. As of this date, in spite of her excellent experience and background and skills, Swanson remains unemployed despite excellent secretarial skills, with outstanding testing and interviewing. As stated above, when Swanson has been down to the wire relating to a possible job offer that gets to the "reference" checking portion, suddenly the interest in Swanson unexplainably goes "South".

42.     Baker is guilty of defamation against Swanson causing injury to Swanson's reputation for not only a negative job reference but one of slanderous information that denied Swanson was even employed by Baker, causing Swanson shame and disgrace in the minds of others. Swanson has been forced into "self publication" of this slanderous information because after realizing that Baker was disseminating information that she had not been employed by them, Swanson was forced to repeat to a prospective employer in the midst of being in the top five (5) candidates that were being called back for a continuing interview process, that she, Swanson, had recently discovered that Baker was stating that she had never worked there for the 5-year period on her resume and that she was in the process of trying to straighten out the misinformation. Baker is liable for further slander when Swanson had to repeat and self-publish Baker's false statements regarding her employment.

18

43.     Baker is liable for Swanson's self-publication of these statements because Baker,

Offdenkamp and Griffin knew or should have known that someone facing circumstances similar

to Swanson's would be compelled to "self-publish" the defamatory statements in order to attempt

to lessen and disarm the impact of Baker's bad reference and straighten out the lie that Baker was

telling about Swanson.  However being forced to disclose or self publish Baker's lies can only

have the effect of further defamation to Swanson and at the very least, cast doubt about Swanson

in the minds of the perspective employer.  It is illegal for Baker and any employer to make a

misrepresentation which prevents or attempts to prevent a former employee from getting a new

job.  This applies to Baker, its agents and/or officers.

WHEREFORE, the Plaintiff prays for:

a.      Compensatory damages in an amount of $150,000 or to be determined at trial to
        compensate the Plaintiff for depression, humiliation, anguish, emotional distress,
        prevention from employment, and defamation, caused by the Defendants'
        conduct.

b.      Award the Plaintiff punitive damages in the amount of $150,000.

c.      The Defendant be required to pay prejudgment interest to the Plaintiff on these
        damages;

d.      A permanent injunction enjoining the Defendant from engaging in the
        discriminatory and retaliatory practices complained of herein;

e.      A permanent injunction requiring that the Defendant adopt employment practices
        and policies in Baker's Human Resources Department in accord and conformity
        with the requirements of Title VII, 42 U.S.C. §§ 2000, et seq., 42 U.S.C. § 1981;

f.      The Court retain jurisdiction of this case until such time as it is assured that the
        Defendant Baker & McKenzie and its agents and assigns remedied the policies
        and practices complained of herein and is determined to be in full compliance
        with the law;

g.     Such other relief as the Court deems just and proper.

October 16, 2012

Respectfully submitted,

Gloria E. Swanson, Plaintiff, pro se

By: *Gloria E. Swanson*

Gloria E. Swanson, Plaintiff, pro se

Gloria E. Swanson, Plaintiff, pro se
8920 S. Chappel Avenue
Chicago, IL  60617-2919
773-731-6014
Fax:  773-731-0391
Email:  Gswanson8920@aol.com
99500 pro se

# **APPENDIX**

EXHIBIT NO.

| | |
|---|:---:|
| Allison & Taylor email to Gloria Swanson dated July 18, 2012 advising Swanson that Baker & McKenzie cannot find Swanson in their system under Swanson's last name | 1 |
| Allison & Taylor Report completed 7/26/12 regarding reference inquiries to Baker & McKenzie for Gloria Swanson | 2 |
| EEOC Charge of Discrimination against Baker & McKenzie filed by Gloria E. Swanson, dated July 23, 2012 | 3 |
| EEOC Dismissal and Notice of Rights, "right to sue" letter, dated August 2, 2012 | 4 |
| Letter from Maura Ann McBreen of Baker & McKenzie to Gloria E. Swanson, dated January 8, 1996 | 5 |
| Termination Agreement and Release in Full between Baker & McKenzie and Gloria Swanson, dated June 19, 1995 | 6 |
| Letter from Carol A. Lincoln of Baker & McKenzie, dated Jun 28, 1995 enclosing the signed Termination Agreement and Release, severance check and outplacement assistance information, including a Letter of Reference from Carol A. Lincoln for Swanson, dated July 31, 1995 | 7 |
| Letter dated August 6, 2012 from Gloria Swanson to Maura Ann McBreen regarding outlining the chain of events in Baker's reference fiasco with copy to Eduardo C. Leite, Chairman of EC | 8 |
| Email to Gloria Swanson from Allison & Taylor dated September 13-14, 2012 recounting call from Nancy Offdenkamp regarding Gloria Swanson's reference | 9 |
| Reference Check Report for Gloria Swanson from Allison & Taylor dated, September 18, 2012 | 10 |
| Faxed employment verification to Rick Rosen, Esq., regarding Gloria Swanson, received from Nancy Offdenkamp, dated September 13, 2012 | 11 |

Letter from Gloria Swanson to Maura Ann McBreen, dated September 21, 2012, addressing the fact that Baker & McKenzie had not contacted Swanson to advise her of any change or update in their initial position regarding Swanson's

references, copy to Eduardo C. Leite                                                    12

Letter, dated September 24, 2012 from Baker & McKenzie's Nancy
   Offdenkamp to Gloria Swanson stating that "verification of your previous
   employment have been completed and returned to requesting parties"          13

Letter to Gloria Swanson, dated October 10, 2012 from Baker & McKenzie's
   Edward J. Zulkey, General Counsel Emeritus, stating, "At this time, we consider
   this matter closed.  Baker & McKenzie will not be responding to any
   additional inquires into this matter."                                                14

Final Reference Report, dated September 18, 2012 from Allison & Taylor
   regarding Gloria Swanson's Reference check relating to employment at
   Baker & McKenzie                                                                          15

Letter to Gloria E. Swanson from the Illinois Department  Of Human Rights,
   dated August 1, 2012 regarding Swanson's EEOC complaint against Baker &
   McKenzie                                                                                      16